**Benjamin F. SAPPINGTON et al.**

v.

**ASSOCIATED TRANSPORT, INC.**

**Civ. No. 70–509–HM.**

United States District Court,
D. Maryland.

Feb. 14, 1973.

---

See also D.C., 54 F.R.D. 202.

---

Benjamin Lipsitz, Baltimore, Md., for plaintiffs.

Robert F. Skutch, Jr., William W. Cahill, Jr., Baltimore, Md., William J. Curtin, Charles P. O'Connor, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

This suit for injunctive relief was originally brought in the Circuit Court for Baltimore City, Baltimore, Maryland and was removed to this Court under 28 U.S.C. § 1446 on the grounds that the action stated a claim under § 301(a) of the Labor Management Relations Act, 61 Stat. 156, 29 U.S.C. § 185(a) (1947).

After Defendant Associated Transport, Inc.'s Motion for Summary Judgment was denied, this case was tried before this Court on January 15, 1973.

Plaintiffs are over-the-road truck drivers employed by the Defendant Associated Transport, Inc. and represent a class of approximately fifty-three drivers, employed at the Defendant's Baltimore terminal. The defendant company is engaged in the business of a common carrier by motor vehicle in interstate commerce for which it holds a Certificate of Public Convenience and Necessity issued by the Interstate Commerce Commission. Plaintiffs are members of the Freight Drivers and Helpers Local Union No. 557 affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter referred to as "IBT"). Pursuant to § 301(a), they bring this action alleging the violation of their collective bargaining agreement, namely, the Maryland-District of Columbia Freight Council Over-The-Road Supplemental Agreement. This agreement between truckers and local unions in the Maryland-District of Columbia area supplements the National Master Freight Agreement negotiated between most of the trucking employers in the United States and the IBT and covers individual work classifications in this specific geographic area.

There is little dispute between the parties as to the facts of this case. On January 19, 1970 and February 11, 1970, Defendant advised its road drivers at the Baltimore terminal, including the plaintiffs in this case, that it was discontinuing its road operation at Baltimore and transferring most of this operation to Scranton and White Deer (Milton), Pennsylvania. These drivers were given the opportunity to choose between relocating in either Scranton and White Deer or being laid off pursuant to the supplemental contract.[1] This change of operations was part of an on-going plan

---

1. As shown in Exhibits 4(b) and 4(c), none of the road drivers of the defendant requested redomicile or relocation and thus, they were subsequently laid off effective February 14, 1970. There is some indication that one of these drivers elected to transfer pursuant to the company's notice to Scranton, Pennsylvania. (Transcript p. 35)

of the company to reduce its number of terminals from sixty-nine to fifteen and its number of road drivers employed from 1200 to 800. Prior to issuing its notice of change of operations, the defendant submitted its proposed reorganization to the Eastern Conference Joint Area Committee, a grievance committee established pursuant to Article 7 of the National Master Freight Agreement and Article 42 of the Maryland-District of Columbia Over-the-Road Supplemental Agreement and composed of representatives of the employers and unions in the Eastern Conference area. It has been stipulated that the change of operations was not submitted to the Joint Maryland-District of Columbia Area Committee.

It is the contention of Defendant that the approval of the Eastern Conference Change of Operations Committee [2] was required by Article 8(e) of the National Master Freight Agreement. That section provides that the employer, before changing its operations, shall submit a proposal for such change to an "appropriate committee". Plaintiffs contend that the proposal for a change of operations should have been submitted first to the Joint Maryland-District of Columbia Area Committee as provided in Article 42, Section 8 of the Supplemental Agreement. The issue before this Court then is whether the "appropriate committee", as alluded to in Article 8(e), is the Eastern Conference Change of Operations Committee or the Joint Maryland-District of Columbia Area Committee.

Preliminarily, it has been argued by the Defendant in its motion for summary judgment and in a motion for directed verdict at the end of the plaintiffs' case that this Court should defer to the decision of the Eastern Conference Change of Operations Committee which approved the change of operations of the Defendant. Defendant has cited this Court to the Steelworkers Trilogy Decisions [United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)], holding that the Court's review of an arbitrator's decision is a narrow one and that such an award should not be set aside for mere errors of fact or law. The philosophy behind these decisions limiting the Court's review is explained as follows:

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed. 363 U.S. at 581, 80 S.Ct. at 1352.

---

**2.** This committee was appointed by the Eastern Conference Joint Area Committee to consider changes in operations.

That a decision by a joint management union committee should be accorded the same deference as those of an arbitrator was decided by the Court in General Drivers, Local No. 89, v. Riss, 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963):

It is not enough that the word 'arbitration' does not appear in the collective bargaining agreement, for we have held that the policy of the Labor Act 'can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.' United Steelworkers v. American Mfg. Co., 363 U.S. 564, 566, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403; cf. Retail Clerks etc., v. Lion Dry Goods, Inc., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503. Thus, if the award at bar is the parties' chosen instrument for the definitive settlement of grievances under the Agreement, it is enforceable under § 301. And if the Joint Area Cartage Committee's award is thus enforceable, it is of course not open to the courts to reweigh the merits of the grievance. American Mfg. Co., supra, at 567–568, 80 S.Ct. at 1346. 372 U.S. at 519, 83 S.Ct. at 791.

Various exceptions have been engrafted on the rule that limits judicial review of the merits of final arbitration and grievance procedure awards. Two of those exceptions, that the union as bargaining agent has breached its duty of fair representation in handling the employee's grievance, Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), and that the grievance procedure is inadequate or unavailable, Rothlein v. Armour & Co., Inc., 391 F.2d 574 (3d Cir. 1968), are not at issue in this case. What is at issue is whether the decision of the Eastern Conference Area Committee in this case was a "jurisdictional" one, or in other words, whether the Eastern Conference Area Committee had the authority to approve the change of operations of the Defendant.

Closely analogous to this case is Bieski v. Eastern Auto Forwarding Co., 396 F.2d 32 (3d Cir. 1968), where the Court was asked to review a union-management Joint Committee decision that the employees' claims did not present a seniority problem to be resolved by mutual agreement of the representatives on that committee. Since there was no absorption of one company by the other as defined under the contract, the committee held that it had no authority to decide the merits of the seniority dispute. The Court in Bieski in holding that a Federal District Court could intervene to decide this type of jurisdictional question stated:

As outlined above, under the Agreement in this case, the consideration of 'absorption' was a jurisdictional decision in the Joint Committee's opinion. In the event M & G absorbed the business of Eastern, then the Joint Committee could solve the 'merits' of a seniority dispute submitted to it under the last sentence of Article 4, Section 5. The decision that there was no absorption meant that M & G could determine seniority as it wanted with respect to the Eastern employees; it was not a seniority problem open for 'mutual agreement,' the lack of which agreement could then be taken to the Joint Committee. Under federal labor law, we think that this 'jurisdictional' question is a proper one for the courts, just as it would be if the question before us were whether or not a given dispute should go to arbitration. And under the standard of Humphrey v. Moore, 375 U.S. at 345–347, 84 S.Ct. 363, we think the decision of the Joint Committee was unreasonable and arbitrary. Moreover, since the adequacy of the proceedings before the Joint Committee was not commensurate with the importance of the 'absorption' question presented, the court should scrutinize fully the 'jurisdictional' application of Article 4, Section 5. Rothlein v. Armour & Company, Inc., supra 396 F.2d at 40.

In Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the issue before the Court was whether to uphold a decision by a joint employer-employee committee purporting to settle grievances under the terms of the collective bargaining agreement, those grievances being the determination of the relative seniority rights of the employees of two companies. Moore challenged the power of the parties and the Joint Conference Committee to dovetail the seniority lists, claiming that there was no absorption within the meaning of the contract. While the Court decided that the contract gave the committee the power to deal with jobs and seniority, it noted in footnote 8 that with respect to the interpretation of conflicting provisions in a collective bargaining agreement:

> Reconciliation of these two provisions, going to the power of the committee under the contract, itself presented an issue ultimately for the court, not the committee, to decide. 375 U.S. at 345, 84 S.Ct. at 370.

In the case before this Court, the central question involves the interpretation of Article 8(e) of the National Master Freight Agreement, prohibiting the transfer of terminals, breaking points and domiciles without the employer having first received approval from "an appropriate committee on change of operations". Squarely presented to the Court is the question of which committee has jurisdiction to approve this change of operations. This question is indistinguishable from the issue in Humphrey v. Moore and *Bieski* of whether the committee had authority to make its decision. Such a question, therefore, comes under the exception to the general rule of judicial deference to arbitration and grievance committees' decisions and should be resolved by this Court.

Plaintiffs contend that the Defendant's proposed change of operations falls squarely within the scope of Article 42, Section 8 ("Change of Operations") of the Maryland-District of Columbia Freight Council Over-the-Road Supplemental Agreement, and that Defendant, as stipulated, failed to submit its proposal to a subcommittee on change of operations appointed by the Joint Maryland-District of Columbia Area Committee as required by that section. Article 42, Section 8 reads as follows:

| | |
|---|---|
| Section 8. | Present terminals, relays or breaking points, shall not be transferred or changed without the Employer first |
| Change of Operations | having asked for and received approval from the subcommittee on Change of Operations, the members of which shall be appointed by the Joint Maryland-District of Columbia Area Committee at each monthly meeting. This shall not apply within a forty (40) mile radius. This subcommittee shall also have jurisdiction over the closing of terminals in regard to seniority. This Committee shall have the power to extend the three (3) year layoff period contained in Article 41, Sections 1 and 4, in considering any change of operations. |

———◆———

That the terminals, relays and breaking points were transferred so as to present a change of operations within the meaning of Section 8 is uncontested.

On the other hand, the Defendant contends that since this change of operations involves two areas covered by separate area supplemental agreements, the appropriate committee to review the change of operations is the Eastern Conference Change of Operations Committee. In support of its argument, the Defend-

ant introduced over Plaintiffs' objection the Rules of Procedure of the Eastern Conference Joint Area Committee in which Article 3, Section 4 reads as follows:

> When a dispute arises involving a change of operations, redomicile, or the opening or closing of a branch, terminal, division, or operation between two (2) areas within the Eastern Conference area, each covered by a separate agreement, such dispute shall be referred directly to the Eastern Conference Joint Area Committee.

At the close of the case, Plaintiffs renewed their objection to the admission of these Rules into evidence with a motion to strike. The basis of Plaintiffs' objection to this evidence was that the Defendant had not shown that these rules were made known through some procedure to the drivers here involved and that there was no authority in the various contracts for the promulgation of these rules. While the Court has been unable to find the specific provision in the various contracts that would authorize the Eastern Conference Joint Area Committee to promulgate these rules, it has found provisions in the National Master Freight Agreement, namely, Article 8(a) which authorizes the National Grievance Committee to adopt rules of procedure[3] and Article 7 in which there are allusions to various rules of procedure of the committees.[4] Furthermore, the Plaintiffs, represented by their union agents at the proceedings where these rules were promulgated, are estopped from raising lack of knowledge of these provisions at this time.[5]

The Court recognizes that labor contracts are often the result of extensive negotiation and economic pressure and that the final agreement often does not purport to be a detailed document that would pass the test of legal precision as applied to contracts in the commercial field. Instead, this contract is a compromise of the economic positions taken by the employer and the employees. Further, the conflicting and imprecise language of the various agreements prevents this Court from resolving the issue before it solely by interpreting the provisions in the collective bargaining contracts. The Court has decided therefore to admit these rules as bearing on the intent of the parties as to which committee might be the more appropriate one in this type of case. Plaintiffs' motion to strike this evidence is therefore denied.

The Court finds considerable logic in Defendant's argument that these agreements represent a pyramidal structure designed by the union and the employer to allocate disputes and grievances among the various grievance committees along geographical lines. No committee would have jurisdiction to decide disputes where the rights of drivers outside the geographical area of that committee would be adjudicated. In this case, drivers of the Maryland area governed by the Maryland-District of Columbia Supplemental Agreement were to be combined with drivers in Pennsylvan-

---

3. The reference to rules of procedure in Article 8(a) is as follows:

   "The National Grievance Committee shall adopt rules of procedure which may include the reference of disputed matters to subcommittees for investigation and report, with the final decision or approval, however, to be made by the National Grievance Committee."

4. The allusion to rules of procedure in Article 7 reads as follows:

   "Time limitations regarding the filing of grievances, if not set forth in the respective Supplemental Agreements, must appear in the Rules of Procedure of the various grievance committees and shall apply equally to employers and employees."

5. Both union and employer representatives compose the Eastern Conference Area Committee and according to the testimony of William Mosely, a member of the Eastern Conference Area Committee when the rules were adopted, the published rules were sent to the various Local Unions. (Transcript p. 178 & 179)

ia covered by the Central Pennsylvania Supplemental Agreement.[6]

If only the rights of drivers in Maryland were to be affected by this change of operations, the Court would agree with the Plaintiffs that the Joint Maryland-District of Columbia Area Committee was the appropriate committee to which the plan should have been submitted initially. However, should the resolution of any dispute involve the rights of both the Maryland and the Pennsylvania drivers, neither a committee composed solely of Maryland drivers nor a committee composed solely of Pennsylvania drivers could fairly resolve that dispute. It would be necessary to submit that question to a committee jointly of union and employer representatives which would span both geographical areas, namely, the Eastern Conference Change of Operations Committee.

Article 5 of the National Master Freight Agreement governs seniority rights under the collective bargaining agreements. It is provided in subsection 5(b)(2) that when an operation is closed or partially closed and the work of the operation is transferred to another terminal in whole or in part, the employee of the closed or partially closed operation would have the right to transfer to the terminal into which the work was transferred if regular work would be there available. Should the employee elect to transfer, the general rule of Article 5 is that he would go to the bottom of the seniority board at the transferee terminal and would have the right of job selection only in accordance with his seniority at the terminal. The contract provides, however, that he may still exercise his company seniority for lay-off purposes and other contract benefits.

Section 7 of Article 5, however, provides that:

The parties acknowledge that specific situations may arise which may not be covered by the rules set forth in this Article or in which the parties may feel that different treatment of the problem is necessary. In such situation, the Employer, the Unions involved, and the Area, Multi-Conference or National Committees may mutually agree to such disposition of the seniority problems as in their judgment is appropriate under the circumstances. The Change of Operations Committee under the Local Supplements or the National Master Agreement shall have the authority to add to or to modify these rules in specific situations presented to them.

Under Section 7, it would be possible for the Joint Employer-Employee Committee to adjust the seniority rights of both the drivers transferred and the drivers at the transferee terminal. The plan subsequently approved by the Eastern Conference Change of Operations Committee provided for the dovetailing of seniority rights of both the Pennsylvania and the Maryland drivers.[7] The Maryland drivers would not go to the bottom of the board of seniority for the right of job selection but would be interspersed among the drivers at the Pennsylvania terminal. Thus, the Joint Maryland-District of Columbia Area Committee, in the change of operations before this Court, could not make a determination of the job selection seniority that the transferring employee would have at the terminal to which he is transferred since it is without jurisdiction to grant seniority rights at a terminal outside the Maryland-District of Columbia supplemental area and subject to the jurisdiction of a local union not a party to the Maryland-District of Columbia supplement. The Court holds, therefore, that the Joint Maryland-District of Columbia Area Committee was not the committee to which the employer initially had to submit his plan for change of operations, but instead, the Eastern Con-

6. According to the testimony of William Mosely, both White Deer and Scranton are governed by the Central Pennsylvania Supplement. (Transcript p. 182)

7. Defendant's Exhibit No. 1.

ference Change of Operations Committee would be the "appropriate change of operations committee" as provided in Section 8(e) of the Master Agreement.

The holding of this Court is consistent with Safely v. Time Freight, Inc., 307 F.Supp. 319 (W.D.Va.1969), affirmed 424 F.2d 1367 (4th Cir. 1970). Time, a large over-the-road trucking company operating across the United States, sought to close its Bristol, Tennessee terminal, eliminate nineteen employees in its Nashville terminal and to transfer these displaced employees from these to other terminals, principally to Winchester, Virginia. These employees were represented by the IBT and were subject to the same contract as that before the Court today. Time requested approval for this change of operations from the Joint Area Change of Operations Committee, consisting of an equal number of employer and union representatives selected from the geographic area of the Conferences affected by the proposed change of operations, the Eastern and Southern Conferences of IBT. It was the decision of that committee to dovetail the seniority rights of those drivers transferred to Winchester, Virginia. The Virginia Committee had decided that it did not have authority to change the decision of the Joint Area Change of Operations Committee. The Court noted that: "The proper Change of Operations Committee by a decision dated January 4, 1968 granted Time's request and laid down rules for the transfers." 307 F.Supp. at 326.

The Safely case involved a multi-conference change of operations committee rather than a single conference committee with jurisdiction over two areas within the conference. However, the Safely case and this one are apposite in principle, and the results should therefore be the same. Therefore, it is hereby

Ordered this 14th day of February, 1973, that the Plaintiffs are not entitled to the relief sought and that their complaint be, and the same hereby is, dismissed, with costs to the Defendant.